George ARTHUR, et al., Plaintiffs,

v.

Ewald P. NYQUIST, et al., Defendants.

No. CIV–1972–325C.

United States District Court,
W.D. New York.

July 6, 1989.

David Gerald Jay, Buffalo, N.Y., for plaintiffs.

Aubrey V. McCutcheon, Jr., Detroit, Mich., Sp. Counsel for the Buffalo Bd. of Educ., for defendants Superintendent of Schools Eugene T. Reville and the Bd. of Educ.

Offermann, Mahoney, Cassano, Pigott & Greco (David J. Mahoney, and Eugene F. Pigott, Jr., of counsel), Buffalo, N.Y., Local Counsel for the Bd. of Educ.

O'Shea, Reynolds, Napier, Quinn & Cummings (John H. Napier, and Kenneth R. Kirby, of counsel), Buffalo, N.Y., for defendant Mayor James D. Griffin.

Falk & Siemer (Alvin M. Glick, and Mary K. Roach, of counsel), Buffalo, N.Y., for defendant Common Council of the City of Buffalo.

Jaeckle, Fleischmann & Mugel (J. Edmund deCastro, Jr., of counsel), Buffalo, N.Y., for plaintiff-intervenor Community Advisory Bd. for Bilingual Educ. of Buffalo.

Bouvier, O'Connor (Bruce A. Goldstein, of counsel), Buffalo, N.Y., for plaintiff-intervenors handicapped children.

Nat. Educ. Ass'n of New York (Robert W. Klingensmith, Jr., of counsel), Buffalo, N.Y., for defendant-intervenor Buffalo Teachers Federation.

## INTRODUCTION

CURTIN, District Judge.

## INTRODUCTION

Currently pending before the court is the motion of the Buffalo Board of Education ("Board") for funding in excess of the budget appropriation authorized by the Mayor and the Common Council (referred to collectively as "the City") last year for the

1988–89 school year. Despite approximately nine months of litigation and strenuous efforts toward settlement, this dispute has remained unresolved. It must now be brought to a conclusion.

After carefully examining the record, the court has concluded that the Board has failed to establish that it is entitled to any additional funding. Despite repeated opportunities to do so, the Board has failed to comply with the orders of this court and the direction of the United States Court of Appeals for the Second Circuit that it support such a motion with sufficient detail and with adequate explanations of how the various components of its funding request are related to compliance with the desegregation orders of this court. Consequently, its motion must be denied. In addition, the Board has failed to comply with New York State law for much of the funding it sought, and its failure to do so constitutes an independent basis for denying its application with regard to those funds. These conclusions are supported by the investigation and analysis of the court's expert witness, William D. Mahaney.[1]

It is necessary to repeat and to re-emphasize that the court's role in this dispute is limited. That role is not to ensure that all functions of the Buffalo Public School System are financially supported or that education of the highest quality is attained. Rather, the court may intrude upon the funding process involving the Board, the Mayor, and the Common Council only if it appears that desegregation of the schools would be adversely affected by failure to do so. Specifically, the court must determine whether the Board is seeking funds only "to the extent needed to remedy segregation" pursuant to the court's desegregation orders, or "to the further and impermissible extent of accomplishing a general improvement in the quality of the local school system unrelated to remedying the effects of segregation." This court may order funding for programs that *"materially aid* the success of the overall desegregation effort," but must not allow the Board "to use [the] court's broad power to remedy constitutional violations as a means of upgrading an educational system in ways only *remotely related* to desegregation." *Arthur v. Nyquist,* 712 F.2d 809, 813 (2d Cir.1983), *cert. denied,* 466 U.S. 936, 104 S.Ct. 1907, 80 L.Ed.2d 456 (1984) (emphasis added).

■ The conclusion reached today is indeed unfortunate, for there is reason to believe that had the Board presented its needs in accordance with the law, it may have been able to offer a persuasive argument for additional funding. Today's result, however, is not unfair. When the Board makes an application to compel the City to provide additional funds, it must, just as any other litigant, carefully comply with the orders of this court and the court of appeals, as well as with any applicable state law. Because it has failed to do so, however, the present application must be denied.

## DISCUSSION

### a) *Background*

The procedural history of the Board's application, which is set forth in detail in the attached Appendix, will be summarized here briefly in order to put the court's conclusions in context.

In February, 1988, the Board submitted to the City a proposed budget of approximately $282,000,000 for the 1988–89 school year. The proposed budget included a request for approximately $10,000,000 to fund items that were described by Board representatives during subsequent budget hearing testimony as intended for new educational programs that were not required by this court's desegregation orders.

---

1. The court expresses its sincere thanks to Mr. Mahaney and his associate, David Spara, for their diligence, insight, and suggestions during these proceedings. Mr. Mahaney will submit his final bill to the Board and the City for his services, and payment shall be made jointly by the Board and the City as soon as possible.

Because of the decision reached in this case, Mr. Mahaney's service as the court's expert is now completed, and he is relieved from further responsibility at this time.

These were referred to as "A03" items, and the final budget authorized by the City did not include funding for any of these requests. Including approximately $2,000,000 in cuts from other budget requests, the final budget authorized by the City was approximately $270,000,000.[2] The City's contribution to that total was approximately $43,000,000, the balance being supplied by local, state, and federal funding sources.

Although the City had refused to appropriate the full funding it sought, the Board nonetheless voted in June, 1988, to adopt a "spending plan" for the 1988–89 school year of "no less than $282 million," and to bring suit in this court for the difference between its spending plan and the budget authorized by the City. Over two months passed, however, before the Board took any legal action.

When the Board finally brought the present application for additional funding on September 1, 1988, it failed either to specify precisely how much money it needed or to explain how the budget passed by the City failed to allow it to meet any of its legal obligations. When the parties returned to court on the date requested by the Board—over six weeks later—the Board still did not specify how much funding it supposedly needed. Rather, the Board suggested an informal exchange of information between counsel.

Over the ensuing months, the Board consistently failed to heed the court's repeated warnings that it had to document its request with considerable detail in accordance with the direction of the Second Circuit. In short, the Board's filings, although at times voluminous, were inconsistent, confusing, and misleading, and, consequently, were of no assistance to the City or to the court in evaluating the Board's financial needs. Complicating the issues before the court was the discovery that the Board was seeking funding for a budget that exceeded the approximately $282,000,000 budget originally submitted to

the City in February, 1988. Indeed, although the amounts repeatedly changed, at one point counsel for the Board suggested that an additional $27,000,000 to $36,000,000 would be necessary for operation of the schools during the 1988–89 school year. In addition, the court discovered that the Board was spending on some A03 items even before it had been determined whether the Board was entitled to do so. At one point, in an effort to support its motion, the Board submitted a list of cuts in personnel and programs that it claimed would be necessary if it were forced to operate within the City's budget appropriation.

In order to assist with the evaluation of the voluminous and often confusing documents being submitted, the court appointed William D. Mahaney, a certified public accountant, as an expert witness. Although the court was prepared to deny the Board's request for additional funding for failure to comply with its orders, Mahaney was nevertheless appointed because of the importance of school funding to the community. Mahaney's aid thus was sought to assist the court in determining whether, despite the deficient application by the Board, any funds were essential for implementation of integration programs. Mahaney had extensive experience in governmental accounting in general and educational accounting in particular. He also was intimately familiar with the case at bar, having previously served the court as an expert witness following a similar funding dispute, and having maintained contact with the Board since then.

Mahaney and his assistant, David Spara, worked intensively over a period of approximately two months evaluating documents and meeting with the parties or their representatives, and they prepared three reports [3] that have provided invaluable assistance to the court. *See* Items 1177, 1201, 1213.

In his first report, Mahaney found that the documentation submitted to the court

---

**2.** Including all categorical funds, the Board's budget totaled approximately $300,000,000.

**3.** On March 27, 1989, Mr. Mahaney submitted an additional report that dealt with categorical aid. That report is not summarized because it is not pertinent to the court's decision.

by the Board contained much "conflicting and misleading data," Item 1177 at 3, and that at least some of the Board's new budget requests resulted from, for example, "poor budgeting," or "ignoring the law or regulations." *Id.* at 16. He also noted that, although it knew of many changed conditions that would require adjustments of its originally proposed budget even while that application was pending before the City, the Board failed to report those changes to the City before bringing the present motion. *Id.* at 2. Furthermore, Mahaney discovered that the Board's funding request was inflated in many respects. *Id.* at 22.

In his second report, Mahaney noted that he had encountered difficulty in obtaining sufficient information to evaluate the Board's claims because, "[a]lthough the Board representatives answered the questions asked of them, they volunteered little useable information." Item 1201 at 2. Consequently, Mahaney found that making a precise evaluation of the Board's budget was "difficult if not impossible." *Id.* at 2–3. He found his task further hampered by "the inconsistent information in the Board's affidavits," and by the sheer magnitude of the changes reflected in over 140 accounts since the Board had submitted its original budget request to the City in February, 1988. *Id.* at 3. He also noted that he continued to find many examples of unnecessary or inflated budget items, illustrations of what he referred to as the Board "grossing up" its budget. Item 1201 at 5; *see also id.* at 8, 21, 27.

Mahaney's second report also corroborated one of the most frustrating obstacles to adjudication of the present dispute: the Board repeatedly changed the figures it was representing as necessary for compliance with this court's orders without ever acknowledging to the court or to the City that it was doing so. In addition, Mahaney's report revealed several significant examples of questionable budgeting decisions made by the Board and savings that the Board had been either unable to find or unwilling to acknowledge. The report also identified many significant deficiencies in the formats used by the Board to make its

funding requests, and noted that effective scrutiny of the Board's budgetary practices is jeopardized by the lack of comparability between the Board's budget presentations from year to year. Item 1201 at 23–27. Indeed, Mahaney and Spara found the Board's budget presentations to have been prepared so poorly that they concluded that even highly skilled accountants would likely be confused by them if they did not receive "significant technical assistance." *Id.* at 26.

Including savings and other reductions that he was able to identify, Mahaney estimated that the net amount being requested by the Board was $6,877,410. Item 1201 at 23–24. Notably, Mahaney believed that this figure "is probably greater than is necessary to operate the school system for the year 1988–1989," *id.* at 24, and he stated that the inflated components of the Board's funding request identified in his report should not be considered exhaustive. *Id.* at 21–22. Reflecting the striking differences between the components of his net total and the Board's original funding request, Mahaney observed that "[t]he Original Budget submitted to the Mayor in February 1988 has, by the Board's omissions and commissions, become almost meaningless to the City." *Id.* at 27.

In his third report, Mahaney informed the court that he had discovered an additional $842,000 in savings, Item 1213, leaving a net figure of $6,035,410.

When Mahaney concluded his investigation, a hearing was held on February 28, 1989. As Mahaney testified, the scope of his investigation did not include determining whether particular components of the Board's funding request were related to desegregation. Rather, his role was simply to assist the court in evaluating the information being submitted by the Board in support of its motion. *See* Item 1229 at 100–01. But there was nothing in either Mahaney's reports or his testimony that convinced the court that additional funds were necessary for the Board to carry on its integration efforts. Of course, Mahaney's investigation and analysis were primarily based on, and limited by, informa-

tion supplied by the Board, but the Board did not provide sufficient information to justify its claim that it was entitled to any additional money.

b) *The Board's Failure to Meet Its Burden of Proof*

In *Arthur v. Nyquist,* 712 F.2d 809 (2d Cir.1983), *cert. denied,* 466 U.S. 936, 104 S.Ct. 1907, 80 L.Ed.2d 456 (1984), the United States Court of Appeals for the Second Circuit, in affirming this court's resolution of a similar funding dispute, *see* 547 F.Supp. 468 (W.D.N.Y.1982), noted that it expected the Board to supply a more detailed justification than it had for the 1982–83 school year in support of any future request for funding beyond the City's appropriation. *Id.* at 811. The Second Circuit also stated that

> [s]hould a dispute of this nature recur, we think it will normally be helpful if those who seek a court order for additional funding, and those who oppose such an order, supply the District Court with *considerable detail* reflecting the proposed expenditures in the absence of the additional funds claimed to be needed.

*Id.* at 814 (emphasis added). The Board was thus put on notice long ago of the importance of documenting its funding requests with "considerable detail" in order to meet its burden of proof. *See* 547 F.Supp. at 472. *See also Arthur v. Nyquist,* 618 F.Supp. 804, 809 (W.D.N.Y.1985).

When disputes subsequently arose concerning funding for the 1983–84 and 1984–85 school years, however, the Board continued to be less than forthcoming with information. After several months of careful investigation and analysis that included fifty days of testimony, Magistrate Edmund Maxwell observed with obvious frustration that "the Board's written justification and explanation to the City for its various budget request increases were mostly inadequate," *Arthur v. Nyquist,* 618 F.Supp. at 839 (Appendix), and that "[t]he Board would likely find less opposition to its requests if it was more open in explaining its increased needs." *Id.* 840. Noting that

the Board "regularly" replied to inquiries from the court and the City by claiming that the requested information "was not available in the format desired," the Magistrate implored the Board to "accept the responsibility of providing the additional records and justification needed by the Court and City to evaluate [its] requests" if it intended to continue seeking court-ordered funding in excess of the City's appropriation. *Id.* at 838.

In the order adopting the magistrate's findings and recommendations, this court noted that it considered the accounting and reporting procedures used by the Board to be "extremely deficient." 618 F.Supp. at 808. The court also noted that the Board's bookkeeping methods were so inadequate that the Board's ability to provide readily "more useful and complete detail to the City" than it had previously was "not readily possible," and warned that "[t]his is a deficiency which cannot persist and which the court will not tolerate if the Board seeks judicial intervention in any subsequent year." *Id.* at 810.

Despite these warnings, the Board did not even indicate how much money it was seeking when it brought the present motion last September. Instead, approximately six weeks later, the Board suggested that the parties embark on an informal discovery process, as if to imply that—for some as yet unexplained reason—the Board needed information from the other parties before it could even hazard a guess as to how much money it supposedly needed.

Over the ensuing months, the Board was warned time and again that its submissions were inadequate. Yet the Board, seemingly oblivious to these admonishments, continually provided insufficient documentary support for its funding request. As noted above, the Board's submissions, although at times voluminous, were generally inconsistent, confusing, and misleading. Indeed, as noted above, even the court's expert found them extremely difficult to decipher, and he concluded that even highly skilled accountants would be confused by them.

Furthermore, the Board, despite many opportunities to do so, failed to demon-

strate sufficiently how the various components of its funding request were related to compliance with the desegregation orders of this court. The Second Circuit has defined the scope of the issue before this court when faced with a request for additional funds by the Board. Specifically, as noted above, the court must determine whether the Board is seeking funds only "to the extent needed to remedy segregation" pursuant to the court's desegregation orders, or "to the further and impermissible extent of accomplishing a general improvement in the quality of the local school system unrelated to remedying the effects of segregation." This court may order funding for programs that *"materially aid* the success of the overall desegregation effort," but must not allow the Board "to use [the] court's broad power to remedy constitutional violations as a means of upgrading an educational system in ways only *remotely related* to desegregation." 712 F.2d at 813 (emphasis added). Instead of supplying the detailed explanations ordered by the court, however, the Board provided copious but, nonetheless, uninformative submissions.

Accordingly, the court finds that the Board has failed to establish that it is entitled to any additional funding. The Board simply has not provided convincing evidence in support of its claim that the City's appropriation was insufficient to ensure compliance with the court's desegregation orders. The court thus does not credit the Board's assertions regarding the cuts that would have to be made if it does not receive additional funding. Indeed, that threat was made on December 1, 1988, when the Board was claiming that it needed nearly $17,000,000 more than the City had appropriated. Since that time, Mahaney's investigation and the Board's own actions and admissions have demonstrated that that was a highly inflated figure. And at no time, in either his reports or his testimony, did Mahaney state that the Board was entitled to any particular amount, and it was not his role to do so.

In short, the Board has failed to convince the court that it cannot operate on the funding it received from the City without cutting programs or services that are necessary for compliance with the court's desegregation orders.

Although the court's decision is supported by Mahaney's findings, it does not hinge on those findings. The court's denial of the Board's motion is based on the Board's failure to meet its burden of proof by documenting with sufficient detail that the funds it seeks would "materially aid the success of the overall desegregation effort," rather than simply upgrade the Buffalo Public School System "in ways only *remotely related* to desegregation."

### c) *New York Education Law § 2576*

During the meeting held on November 17, 1988, counsel for the Board stated that as much as an additional $36,000,000 might be necessary for the 1988–89 school year. Although counsel soon abandoned that figure, the Board indicated in affidavits submitted two weeks later that it was still seeking nearly $17,000,000. Although the amount of additional funding sought by the Board remained unclear after those affidavits were submitted, it was apparent, since the City had authorized all but approximately $12,000,000 of the budget proposed by the Board in February, 1988, that the Board was seeking funding in excess of that originally sought from the City.[4]

As the Board was told in an order dated January 19, 1989, *see* Item 1166, its initial failure to submit an emergency funding request pursuant to the requirements of state law raised a fundamental question with regard to the court's jurisdiction to even consider those portions of the Board's funding request that exceeded the funding originally sought from the City. Comment on that statutory procedure and the extended delay that occurred before the Board invoked it is appropriate here to help avoid confusion in the future regarding the Board's responsibility to comply with state law.

---

4. *See* Appendix at note 4 and accompanying text for examples of individual accounts for which

the Board was seeking funding in excess of that originally sought from the City.

New York Education Law § 2576(6) provides:

A board of education may, to meet emergencies which may arise, submit a special estimate in which items for extraordinary expenses may be submitted to meet such emergencies. Such estimate shall contain a complete statement of the purposes for which the items are requested and the necessity therefor. The same method of procedure shall be followed in submitting such estimate and such estimate shall be subject to the same consideration and action as is required in the submission, consideration and action upon the regular annual estimate submitted by a board of education. The common council or other legislative body in such city shall have power to make the appropriations requested by a board of education in such special estimate.

The Mayor and the Common Council have argued that the Board should have submitted an emergency funding request pursuant to New York Education Law § 2576(6) before bringing a motion for additional funding in federal court that included funding never sought from the City. They also have argued that New York Education Law § 2576(7) precludes the Board from spending in excess of its budget appropriation. That section provides: "A board of education shall not incur a liability or an expense chargeable against the funds under its control or the city for any purpose in excess of the amount appropriated or available therefor or otherwise authorized by law." In support of their argument, they have cited *Emerson v. Buck*, 230 N.Y. 380, 130 N.E. 584 (1921), in which the New York Court of Appeals previously rejected a claim by the Buffalo Board of Education that it had the authority to spend in excess of the funds appropriated by the City.

The Mayor and the Common Council have not argued that it was improper for the Board to bring a motion challenging the City's refusal to provide funding as originally requested by the Board; rather, they have argued that the Board should have employed the statutory procedure

with regard to those portions of its present funding request that were not presented to the City in February, 1988.

Although the Board eventually submitted a request pursuant to Section 2576(6), it has never conceded that it was required to do so. In support of the Board's claim that it is not required to follow the statutory procedure, counsel for the plaintiffs, citing *Patsy v. Florida Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), has argued that the Board need not exhaust its administrative remedies before submitting funding requests to the court that were not previously considered by the City.

Yet it is entirely inaccurate for the Board to characterize the state statutory framework for emergency municipal appropriations as an "administrative remedy." With regard to funding requests never previously presented to the City, the Board has no basis to claim that it is seeking a "remedy" because those requests were never denied by the City.

Plaintiffs' counsel also cited *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 4 L.Ed. 97 (1816), to support his argument that federal law controls if it conflicts with Section 2576(6). Yet that argument begs the question of whether a conflict even exists. Although federal law obviously would control if there were a conflict, neither counsel nor the Board has established that, in fact, one exists. Section 2576 does not prevent the Board from seeking additional funds from the court; in fact, subsection 7 explicitly states that "[a] board of education shall not incur a liability or an expense chargeable against the funds under its control or the city for any purpose in excess of the amount appropriated or available therefor *or otherwise authorized by law* " (emphasis added). Rather, the statute merely provides a procedure to obtain supplemental funding from the City for unanticipated expenses.

■ To be sure, the City cannot shirk its constitutional duties simply by claiming that compliance with court-ordered desegregation remedies is too costly. But the

Board cannot use its constitutional obligation to administer a desegregated school system to escape its statutory obligation to be a responsible participant in the City's annual budgetary process. Any money given to the Board must necessarily be diverted from other municipal needs, and the Board is not entitled to deny the City notice of what the Board believes its financial needs to be when the City plans its yearly budget or makes adjustments for emergency funding. Indeed, to hold otherwise would invite fiscal chaos, a result which, of course, could prevent the Board from providing even a semblance of the kind of education it hopes to furnish. And needless delay in submitting an emergency funding request will serve only to hamper the City's ability to reapportion its budget outlays.

It is, consequently, reckless for the Board, as it has done several times, to embark on a so-called "spending plan" before making either an emergency funding request for unanticipated expenses or a motion in this court for funding that the City considered but denied. As the court has previously noted, it is extraordinary for the Board to operate as if it has an absolute right to spend in excess of the funds allocated by the City. *See* Item 1125 at 9. The Board's failure to comply with the requirements of § 2576(6) constitutes an independent basis for denial of the Board's motion insofar as it relates to funding in excess of that originally sought from the City in February, 1988.

In short, the Board must recognize and fulfill its responsibilities as a fiscal partner of the Mayor and the Common Council, and those responsibilities include making detailed emergency funding requests pursuant to Section 2576(6). Of course, if such a request is denied or unreasonably delayed, the Board may bring a properly documented application for additional funding in federal court, the evaluation of which will be expedited by examination of the record made by the Board and the City during the emergency funding process. But if the Board does not receive approval of its proposed annual budget or any supplemental requests made under Section 2576(6), it shall not spend in excess of the City's appropriation unless and until this court orders the City to supply additional funding.

d) *The Need For Appointment of a Special Master*

In light of the record in this case, the court has considered appointing a special master to oversee management of the Board's budget and the Board's participation in the budget appropriation process. The conduct of the Board during the course of the court's consideration of its motion was extremely disturbing, particularly because such conduct has been repeatedly and severely criticized in the past. Because of the nature of this case and its importance to the citizens of Buffalo, the court gave the Board more opportunities to make its case than would have been given to virtually any other litigant. The Board, however, responded by consistently failing to comply with the court's orders. Furthermore, Mahaney's investigation verified that many significant deficiencies remain in the Board's management of its budget. In fact, the Board's representatives were unable to produce without considerable effort much information that should have been readily available for the Board's own use.

The court has determined, however, that appointment of a special master would be an inappropriate intrusion into the Board's daily operations and its relationship with the City. This is particularly true in light of the court's limited role and the fact that most of the funds supplied to the Board by the City do not relate to the court's integration orders. As a practical matter, it should be left to the Board to determine whether to improve its internal management or to continue as it has in the past.

But the need for the Board to act swiftly and decisively to improve the manner in which it manages its budget is clear. The primary reason for the difficulty encountered by the court and its expert in obtaining the information necessary to evaluate the Board's application resulted from the Board's failure to implement proper management, accounting, and data processing systems. Yet such systems and the

trained personnel necessary to design and to implement them are crucial if the Board is to manage its appropriated funds as effectively, efficiently, and responsibly as possible.

The need for such reforms is buttressed by the size of the Board's budget. Including all aid sources, the Board's 1988–89 budget totaled approximately $300,000,000, and the City's contribution exceeded $40,000,000. Budgetary deficiencies of the magnitude uncovered during the course of the present funding dispute take on even greater significance when they imperil the management of a budget so large.[5] It is also clear that the availability of timely financial information is essential if the Board is to account readily and accurately for its expenditures. In this regard, an audit by outside personnel at the end of the school year is not enough. Instead, the Board must generate prompt, comprehensive, and accurate financial statements each month. As Mahaney testified at the hearing held in February, current monthly financial reports are essential to effective management of the Board's budget. *See* Item 1229 at 147–49.

Even a cursory review of the many papers filed and the many meetings held both in and out of court during the course of this dispute makes evident that much time, money, and effort were wasted simply because the Board failed to install sensible management, accounting, and data processing procedures that obviously should have been adopted long ago. The evidence in this dispute clearly indicates that the adoption of programs such as those suggested by Mahaney over the years will result in more effective, efficient, and responsible budgetary management by the Board.[6] The Board would thereby be enabled to analyze past programs with added insight and to express its financial needs to the City and to the public more clearly and persuasively. Furthermore, by constructively reforming the management of its budget, the Board will enable the court to evaluate its needs in any future funding dispute swiftly and accurately. If the Board fails to act, however, the consequence may be the denial of a future application for additional funding.

The court does not question the intentions of the Board. There is no reason to doubt the Board's sincerity and determination to desegregate and otherwise to improve the public school system. But good intentions are not enough. The manager of a $300,000,000 budget simply cannot afford the type of budgetary laxity exposed during these proceedings. When a funding dispute of this nature arises, it is incumbent upon the Board to have readily available all data necessary for an accurate evaluation of its needs in a form that is conducive to a swift resolution of all pending issues.

## CONCLUDING COMMENTS

The Board has made tremendous strides toward the goal of desegregating the Buffalo Public School System. It has made equally impressive strides in otherwise improving the overall quality of the schools. For example, children's test scores in reading and mathematics have substantially improved, dropouts and truancies have declined, and average daily attendance has risen to over 92 percent—the highest such rate for any large urban district in the state. In addition, the Magnet School Program has received national recognition, and a number of the schools have become mod-

5. By so stating, the court does not intend to point an accusatory finger at any particular Board representative. In fact, some Board representatives attempted to cooperate with the court's expert as much as possible. In particular, the court wishes to express it appreciation for the efforts made by Deputy Superintendent Albert Thompson.

6. For example, upon the conclusion of the disputes over funding for the 1983–84 and 1984–85 school years, Mahaney was retained as the court's expert to assist the Board and its staff in improving management of the Board's budget, and he made several recommendations that were summarized in four reports. *See* Items 912, 1050–52. Some of his suggestions were adopted by the Board, but, as the history of the present dispute and Mahaney's most recent reports make clear, the Board failed to implement adequately Mahaney's most significant recommendations.

els for other schools across the country. These and many other achievements of Buffalo's schoolchildren that have resulted from the vigorous and innovative efforts of the Board are understandably a source of great pride for the entire city, and nothing in this order should be interpreted to suggest otherwise. And if, as the Board claims, financial support by the City has dropped considerably over the past ten years while reliance upon state aid has increased, the City must be prepared to increase substantially its support for the schools should future decreases in state aid threaten these achievements.[7]

But as stated repeatedly by both this court and the Second Circuit, it is not the role of this court to upgrade the quality of education provided in Buffalo's public schools in ways that are only remotely related to desegregation. The quality of education provided to our children above that which is required to implement the desegregation remedies of this court depends on the collective will of Buffalo's citizens as expressed through their elected officials. The purpose of this court's desegregation orders is to ensure that the benefits of education are made available to all of Buffalo's schoolchildren on an equal basis. But that is the extent of the court's jurisdiction. It is up to the citizens of Buffalo to determine how good that education will be.

The court is well aware of the political realities of governmental budgeting, and fully realizes that it often involves, perhaps inevitably, a good deal of gamesmanship by both those seeking and those dispensing municipal funds. But the Board, the Mayor, and the Common Council must not forget that they are all defendants in this case and, consequently, have a joint responsibility to desegregate the schools. If this court is ever to remove itself from the administration of the Buffalo Public School System, and if the parties are ever to redirect their energies from litigation to education, the defendants must learn to work together to desegregate our schools.

There is no better investment in our future than the education of our children. Providing the best school system possible should thus be the goal of all those entrusted with this responsibility. If, however, we are to achieve that goal, cooperation rather than confrontation must be the guide followed by the Board, the Mayor, and the Council.

For the reasons set forth in this decision, the application of the Buffalo Board of Education for additional funding is denied.

So ordered.

## APPENDIX

In order to put in context the need for the action taken today, the history of the present funding dispute will be set forth in considerable detail. As will become apparent, the manner in which the Board attempted to justify its application was inconsistent, confusing, and misleading. Furthermore, the Board repeatedly failed to comply with the court's orders regarding the documentation necessary to support its application.

### a) *Procedural Background*

On February 1, 1988, the Board submitted to the Common Council a proposed budget of $282,581,478 for the 1988–89 school year. *See* Item 1095, Exhibit B. In its proposed budget, the Board defined

---

**7.** A few examples should suffice to illustrate the significant needs of the school system unrelated to desegregation for which the Board may become increasingly reliant on the City.

First, many schools were constructed some time ago and will have to be replaced shortly. There are currently 76 school buildings in the public school system, 46 of which were built before 1930, 15 of which were built before the end of World War I, and 5 of which were built at the turn of the century or earlier. Only 3 schools have been built since 1970. In all school buildings, there are serious maintenance problems that have not been addressed for several years, and continued delay in addressing them will result in more expensive remedies in the years ahead.

Second, greater funding may be necessary for music, art, and physical education programs, as well as for library services.

Third, the Board may need additional funding to shoulder its heavy responsibility to provide education for the handicapped pursuant to federal statutes and court orders.

four funding categories: "A00—Carry Forward," for which $243,188,629 was designated; "A01—Regents Action Plan," for which $1,171,441 was designated; "A02—Other Mandates," for which $28,258,486 was designated; and "A03—Other Requests," for which the Board earmarked $9,962,922.

According to the Board, the A00 portion of the budget request represented the same programs provided in the 1987–88 school year with modifications designed to accommodate added financial demands caused by such things as increases in salaries and fringe benefits and the hiring of additional staff due to increased student enrollment. The Board described its A01 accounts as the cost of compliance with those aspects of the New York State Regents Action Plan that had to be implemented during the 1988–89 school year. The Board described the A02 portion of the budget request as containing programs previously included in the Board's budgets but which were now financed through the Special Aid Fund, as well the cost of additional staff and services required by either this court's orders, state law, or regulations issued by the state's Commissioner of Education. Item 1095, Exhibit B at II. See also id., Exhibit C at 24–25, 88–92. A03 funds were intended "to provide improvements to the basic programs provided in A00 through A02. Included here are programs such as primary art, music, and physical education, class size reduction, improved supply of equipment, books and supplies." Id., Exhibit B at II. See also id., Exhibit C at 25, 92–93.

On March 11, 1988, the Mayor convened a hearing to consider the Board's budget request. During the hearing, Board representatives asserted that the requested A03 appropriation was intended for "entirely new programs," Item 1095, Exhibit C at 93, and that it "doesn't come under the mandates." Id. at 97. The A03 request was described as "new program initiatives and services we are convinced are needed to close some of the educational opportunity gaps that exist between our children and those of neighboring districts." Id. at 25.

On May 2, the Mayor recommended a budget of $267,175,000. On or about May 16, a Board representative told members of the Common Council that he would recommend that the Board not file suit in federal court if the Council increased the appropriation by $3,500,000. On May 22, the Common Council voted to increase the budget to $268,925,000, thereby adding half the amount sought by the Board's representative. The Mayor subsequently vetoed the increase, and his recommendation became the final budget for the Board on June 8 when an attempt by the Council to override the veto failed. Adding a federal magnet grant, the Board's final budget totaled $270,275,000.[1] See Items 1083, 1090; Item 1133 at 6, Appendix One; Item 1177 at 2, 7; Item 1201 at 6. The City's contribution to that total was approximately $43,000,000, the balance being supplied by local, state, and federal funding sources.

Despite the City's failure to appropriate the full funding it sought, the Board voted on June 22 to adopt a spending plan for the 1988–89 school year of "no less than $282 million dollars, subject to a modification upward if additional funds are provided by order of the U.S. District Court." Item 1095, Exhibit J at 4. See also Item 1124 at 55–57. Although that day the Board also decided to bring suit in this court for additional funding, Item 1095, Exhibit J at 4, over two months passed before any legal action was taken.

On September 1, the Board finally moved for an order to show cause why the City of Buffalo should not be ordered to provide an appropriation that was "sufficient" to enable it "to comply with the desegregation orders of the Court, meet other State and U.S. constitutional obligations, become a unitary school district and attain 'unitary status,' and meet all state and federal regulatory mandates applicable to public school children" in Buffalo. Items 1082–83. The Board failed, however, to specify what

---

1. Including some federal categorical funds that were not listed in its original budget proposal, the Board's budget totaled approximately $300,000,000.

would constitute a "sufficient" appropriation or how the funds already appropriated failed to allow the Board to meet any of its legal obligations.

On the return date for the order to show cause, October 13, counsel for the Board suggested an informal exchange of information between counsel in order to save time, and he recommended thirty days to do so. Item 1087 at 2–4. He characterized what the Board would need to establish in order to justify its request for additional funds as "a simple matter." *Id.* at 3. When the court noted that there appeared to be some urgency to the Board's request, counsel for the Board responded: "Well, the only urgency that would occur is if the City decided that they wanted to raise the question about the manner in which we are operating," *id.* at 4, as if to suggest that he would be surprised if the Board's decision to adopt a spending plan of at least $282,000,000 were to meet with significant opposition from the City. What the Mayor and the Common Council did not know at the time was that the Board intended to submit a proposed budget to the court that was even larger than the budget originally submitted to the City.

The Court made clear that the funding dispute was a matter of great urgency and was to be treated as such by the parties. *Id.* at 6. Although all counsel were willing to pursue informal discovery as suggested by counsel for the Board, counsel for the plaintiffs complained that "[w]e haven't been able to respond to Mr. McCutcheon's papers, because we just don't have information as yet. It has been promised [by the Board], but we don't have it." *Id.* at 10.

On November 2, the Mayor and the Common Council filed notice of a cross-motion for a preliminary injunction to enjoin the Board from spending in excess of the City's budget appropriation, claiming that if the Board did so it would be violating New York Education Law § 2576(7) and Sections 43 and 44 of the Buffalo City Charter.[2] The Mayor and the Common Council also demanded that the Board supply, in accordance with the Second Circuit's admonition in *Arthur v. Nyquist,* 712 F.2d 809, 814 (2d Cir.1983), *cert. denied,* 466 U.S. 936 (1984), details of the expenditures it would make in the event that it did not receive any additional funding. They also decried the Board's failure to provide detailed justifications for its alleged need for additional funds. *See* Items 1089–95; *see also* Item 1096. The court ordered the Board to make a suitable reply by November 17. Item 1098.

On November 14, the Board filed a motion for a temporary restraining order, claiming that the City had a $4,100,000 surplus from the 1987–88 fiscal year, and that it should be precluded from spending those funds without prior authorization from the court. *See* Item 1099. In support of the motion, the Board offered an affidavit maintaining that the City's appropriation was insufficient to enable the Board to "implement desegregation and achieve a unitary system." Item 1102 at ¶¶ 8, 9. The affidavit cited examples of how programs and services had been cut or reduced, but, for the most part, did so in very general terms. For example, the affidavit stated that class time for art and music had been reduced, and that services involving guidance counselors, social workers, and school nurses had been cut. *Id.* at ¶ 10(i)–(1). The affidavit failed, however, to specify how such programs and services

---

**2.** Article 3, Section 43 of the City Charter provides:

No department, division, city agency or officer shall incur any expense or liability on behalf of the city to be met by general taxation nor attempt to bind the city in any way unless there be available an appropriation for such expense or liability.

Article 3, Section 44 of the City Charter provides:

Each department, division and city agency and each officer thereof shall be governed by the appropriations allotted [sic] thereto in the budget or increased as in this act provided, and shall not incur any expense or liability in excess of any such appropriation as originally made or increased.

were related to compliance with the court's desegregation orders.

The court met again with all counsel on November 17, at which time the Board withdrew its motion for a temporary restraining order. Item 1124 at 22–23. During the meeting, counsel for the Mayor and the Common Council complained that they had not received sufficient information from the Board to evaluate its request for additional funds. For example, they had requested the Board to divulge the rate at which it was spending. It appears that in the past the City had been able to gauge the rate at which the Board was spending by examining the Board's monthly financial statements, which, according to the City, had been supplied by the Board within approximately thirty to forty-five days of the end of a given month. As of the November 17 meeting, however, the Board had supplied such statements only through June, 1988. *Id.* at 12–16, 41, 58–59, 70–71. *See also* Item 1138; Item 1147 at ¶ 19. Counsel for the Board did not offer any explanation for the failure to supply the monthly statements other than to say that the statements had not been completed. He did admit, however, that he did not even know the rate at which the Board was spending, and that the Board itself was still attempting to make that determination. Item 1124 at 50–51, 70–71. *See also id.* at 60–62. Furthermore, he asserted that the Board was not concerned with whether it was spending within the budget authorized by the City, *id.* at 51, a position, the Board was subsequently warned, the court considered "extraordinary." *See* Item 1125 at 9. It was during this meeting that the court first learned that the Board anticipated that it might need an additional $27,000,000 to $36,000,000 for the 1988–89

school year, and counsel for the Board conceded that the City had not been so informed before making its allocation for the Board's budget. Item 1124 at 54. According to counsel for the Common Council, the City had not learned of these figures until October 13. *Id.* at 40.

The court made clear that the Board had not supplied sufficient information for either its request for additional funding or its response to the City's motion for a preliminary injunction. *Id.* at 16–17, 55–56. The court warned the Board that it was prepared to deny outright its request for additional funding if the Board did not provide sufficiently detailed information to justify its position, *id.* at 67–68, and counsel for the Board agreed that the Board should and would do so. *Id.* at 59–60. He even went so far as to indicate that the information could be provided in one week. *Id.* at 62. The court also made quite clear its desire to decide as quickly as possible the issue of whether the Board was entitled to any additional funding. *Id.* at 42–43, 67.

In an order dated November 23, 1988, the court again warned the Board that its response to the City's motion was inadequate.[3] The court also characterized as "urgent" the need for the Board to offer clear and detailed reasons in support of its application for additional funds, and directed the Board to supply the following materials by December 1: the budget under which the Board was operating; a proposed budget within the City's appropriation; the proposed budget for which the Board was requesting funding; a budget comprised of the City's appropriation plus the additional $3,500,000 that a Board representative had indicated would have averted the Board's motion for additional funding; and the Board's monthly financial statements for July through October, and, if available, for November. The court also attached to the

---

**3.** At the November 17 meeting, counsel for the Board had indicated that the papers submitted in support of the Board's motion for a temporary restraining order would also constitute the Board's response to the City's motion for a preliminary injunction. *See* Item 1124 at 6, 23. Those papers consisted of three affidavits: one simply addressed the existence and amount of the City's surplus; another merely recited the

recent procedural history of the case and asserted that there would be no irreparable harm to the City if it were restrained from spending surplus funds; and the third, discussed *supra* at page 6, cited in very general terms examples of how programs and services had been cut or reduced, but failed to specify how they were related to desegregation.

1497

order a suggested format for the information. *See* Item 1111.

In response to the court's order, the Board filed additional affidavits on December 1. *See* Items 1114–16. They were, however, clearly inadequate both in form and in substance. None of the affidavits explained how the additional funding sought by the Board was related to the requirements of any desegregation mandates, and the information contained in the affidavits was not offered in a format resembling the A00–A03 breakdown contained in the proposed budget originally submitted by the Board to the City.

In two of the affidavits, moreover, the Board claimed that it would need "at least" an additional $16,848,562 for the 1988–89 school year, a figure that had never before been proposed to the court. *See* Item 1114 at ¶ 6; Item 1116 at ¶ 4. The affidavits and the attachment to one of the affidavits thus documented for the first time that the Board was seeking funding in excess of that originally sought from the City on February 1, 1988.[4] The Board was asking the court to order funding for a budget of $287,123,562, nearly $5,000,000 larger than the budget it originally had submitted to the City.[5] No explanation was offered for the large discrepancy between the $16,848,-562 figure and the $27,000,000 to $36,000,-000 previously claimed by the Board's counsel to be needed.

In addition, instead of supplying a budget comprised of the City's appropriation plus $3,500,000 as directed by the court, the Board merely stated that it had "never proposed" such a budget. Furthermore, no financial statements were provided. Final-

ly, the Board submitted a list of cuts in personnel and programs that it claimed would be necessary if it were forced to operate within the City's budget appropriation. *See* Item 1115 at ¶¶ 7–8; Item 1115(A) at Attachment E.

In a meeting on December 7, the court conveyed its dissatisfaction with the Board's reply, and again told the Board that it had to provide more detailed documentary support for its claims before the court would even consider conducting a hearing. Item 1210 at 3–5, 42–44, 51–52, 64–65, 68–70, 107–08. Counsel for the Common Council stated with obvious frustration that, although his clients had been on very amicable terms with and were "very supportive" of the Board, he felt the Board was "stonewalling" by refusing to produce appropriate documentary support for its motion. *Id.* at 20–24. When asked why the monthly financial statements were not produced as ordered, counsel for the Board responded that they had not yet been prepared. When asked why the court had not been so informed earlier, counsel for the Board stated, astonishingly, that the unavailability of the reports "is not of any importance," *id.* at 36, and he offered a copy of a memorandum he had received from the Board in which it was claimed that until the Board's final appropriation had been determined, a monthly report "is not informative." Once again, the court emphasized the need to resolve the Board's motion "as soon as possible," *id.* at 69, and the court was assured that all of the information it sought would be provided within three weeks. *Id.* at 108.

Due to the Board's previous failures to supply sufficient information, the court issued a third scheduling order on December

---

4. The attachment to one of the affidavits, Item 1116, disclosed to the court for the first time particular accounts for which the Board was requesting funding in excess of that originally sought from the City. The following list contains accounts with some of the more significant differences, followed by the amount by which the two requests differed:

2110–120:  $941,506
9950–900:  591,197
5540–442:  500,027

2110–131:  186,347  ($75,000 over City's appropriation)
9020–800:  141,886
1622–161:  81,212
5550–472:  74,250

5. The attachment to one of the affidavits erroneously represented the Board's original budget request as $282,845,217. *See* the final page of Item 1116, Attachment A. *See also* Item 1210 at 7. The Board later informed the court that the $263,739 discrepancy was due to a clerical error. *See* Item 1133 at ¶¶ 15–16.

13. In that order, the Board was clearly warned that if the school system did not receive funds to which it otherwise might have been entitled, "the failure will be on the shoulders of the Board for not providing in a timely manner the materials required by the court." Item 1125 at 1. *See also id.* at 3, 13. The court ordered the Board to provide information and materials that were sorted into ten separate categories, and to support its requests with detailed explanations pertaining to each account for which it was requesting additional funding. *Id.* at 11–13.

Although the Board was instructed to provide a detailed explanation by December 20 if any of its monthly financial statements were not available, it submitted an affidavit on December 21 stating that the October statement would not be available before mid-January, and claiming only in very general terms that it was not unusual for preparation of the statement to take so long. *See* Item 1128. *See also* Item 1133 at ¶ 5; Item 1142. The Board finally provided the October financial statement on January 6, 1989. *See* Item 1141.

In response to the other instructions in the December 13 order, the Board filed two new affidavits on December 28. *See* Items 1132, 1133.[6] The budget breakdowns supplied by the Board, however, were woefully inadequate. *See* Item 1133, Appendix One. The court had directed the Board to supply each of the five budgets listed in the attachment to one its earlier affidavits, Item 1116, in the A00–A03 format to allow ready comparison with the budget book originally submitted to the City in February, 1988. *See* Item 1125 at 11, #1.[7] Instead, the Board supplied a breakdown only of its original budget request in the required format—a breakdown that already had been provided to the court months earlier. For most of the other projected budgets, constant reference to other portions of the affidavits and appendices is necessary for

any comparison. Moreover, no explanation information was supplied for the projected budget comprised of the City's appropriation plus the additional $3,500,000 that the Board had indicated would have averted its motion for additional funding, thereby leaving the reader to compare two separate budgets by individual accounts in order to decipher where the additional $3,500,000 was added. *See* Item 1133, Appendix One at Column 10. Furthermore, the Board failed to explain why there were numerous differences between the budget under which it was operating and the one it originally had submitted to the Mayor, or why the total for these two budgets differed by over $500,000. *See* Item 1133, Appendix One at Columns 5 and 7. And, significantly, no breakdown or explanation was offered for the cuts in its spending plan that the Board claimed it would have to make if forced to operate within the City's appropriation. Compounding the problems caused by these discrepancies was the Board's failure to breakdown the "Special Aid Fund" and "Funding Gap" categories as directed by the court's order. *See* Item 1125 at 11, #1.

Moreover, the explanations provided in the appendices to the affidavits were also insufficient, as they primarily offered only relatively general and vague explanations for the Board's various funding requests as they pertained to individual accounts. For example, one of the appendices repeatedly describes the relationship of individual accounts to desegregation of the public schools as "Basic foundation support." *See* Item 1133, Appendix Two.

In addition, although the City had not appropriated funds for A03 programs and the court had not determined whether the City should be required to do so, the Board asserted through the affidavits that it intended to begin implementing the programs outlined in its A03 budget request on January 30, 1989. According to one of the affidavits, "[t]he Board mistakenly believed it could delay these desegregation

---

6. On January 6, 1989, the Board supplied corrected copies of Appendices 3 and 4 to one of the affidavits it had submitted on December 28 (Item 1133). *See* Item 1141.

7. A copy of the budget book is contained in Item 1095 at Exhibit B.

efforts until reminded of its obligations under the Court Order," Item 1132 at 5; according to the other affidavit, the expenditures were planned "at the express direction of our attorney and are necessary for the District to make any new strides toward unitary status. The necessity for these additions will be explained by [the other affidavit]." Item 1133 at 3. The other affidavit, however, provided, for the most part, only vague and, therefore, entirely unhelpful explanations for individual accounts such as "[b]asic foundation support for implementation of program designed to maintain desegregation," and "prevent resegregation." *See* Item 1132, Attachment A.

The Board also failed even to suggest how any portion of its funding request related to a particular order of this court or any other constitutional mandate. The overall insufficiency of the Board's submissions led plaintiffs' counsel to complain that the Board was "either unable or unwilling to lay its cards on the table." Item 1136 at ¶ 6. Plaintiffs' counsel sought to stay proceedings in order to depose members of the Board, but the court refused to do so as it was clear that the delay caused by such discovery would be intolerable. *See* Items 1136, 1140, 1142, 1143, 1152, 1153, 1165.

The Board also submitted a memorandum, Item 1131, in response to the court's instruction that it detail the basis of the court's authority to even consider those portions of its pending funding request that exceeded the funding originally sought from the City. *See* Item 1125 at 12, # 4. However, as noted by the court in an order dated January 19, 1989, *see* Item 1166 at 3, the memorandum merely contained a general discussion of the authority of federal courts to remedy unconstitutional segregation, and was, consequently, inadequate. The memorandum also failed to address the court's directive, issued in response to claims made by the Board's counsel during oral argument, that the Board explain how changes in the law had supposedly modified the applicability of past orders of the court regarding whether various budget requests were related to desegregation. *See* Item 1125 at 12, # 7.

On January 13, counsel for the plaintiffs suggested that, although the Board had not "technically stated [its] case as the Court has previously ordered," and thus was "technically not in compliance and ... in jeopardy under rules of summary judgment," Item 1206 at 7, the court nonetheless should overlook the deficiencies of the Board's papers when ruling on the request for additional funds. The court warned, however, that the Board would not be able to evade its responsibilities under the court's orders, and that the Board was risking dismissal of its application by its continuing failure to document its case as directed. *Id.* at 8–9.

On January 17, the court again conveyed its dissatisfaction with the Board's submissions. Item 1206 at 4–9, 11–14, 21–22, 122–23. When the court emphasized the lack of supporting detail in the Board's papers, counsel for the Board responded: "Well, we can give it, your Honor. We did not consider ... in our judgment, having done these programs for years, that it was important to provide that kind of detail to the City. *If the Court wants that detail* we can provide it either in writing or we can have [Associate Superintendent Joseph] Murray take the stand and testify." *Id.* at 22–23 (emphasis added). Of course, on December 13 the court had explicitly ordered that such detail be provided in writing, and the Board was, and continues to be, the only party even suggesting that its submissions sufficiently responded to any of the court's scheduling orders. Ironically, counsel for the Board insisted that the Board was capable of providing the requisite detail in any form preferred by the court. *Id.* at 12, 14. Further confusing the issues before the court was the assertion by counsel for the Board that the City would have to provide an additional $11,700,000 even if it intended only to fund the A00, A01, and A02 accounts, *see id.* at 82–84, thereby suggesting that its current requests covering A03 costs and unanticipated expenses that became known after the budget presentation to the City totaled less than

$5,000,000.[8] Counsel also thereby suggested that the budget under which the Board was operating did not include expending funds for any A03 programs. *See* Item 1133, Appendix One at Column 7. In fact, however, the Board already had spent funds on some A03 programs and was planning to spend a total of at least $344,335 on such programs, *see* Item 1177 at 8; Item 1201 at 7, 19—before the court had even issued its decision regarding the City's motion to enjoin the Board from expending such funds. *See* Item 1166. Moreover, discovery of this unauthorized spending was itself complicated by the fact that the Board reported it under A00 account numbers in its monthly financial statements, but had presented those same accounts to the City in February, 1988, as part of its A03 requests.[9]

Just prior to the start of the aforementioned meeting with counsel on January 17, the Board had filed—apparently in response to the warning issued by the court on January 13—several more affidavits. *See* Items 1161–64. The affidavits were submitted, among other reasons, to respond to the court's December 13 order and to supplement the previous affidavits submitted by the Board in response to that order. *See* Item 1161 at ¶ 2; Item 1163 at ¶ 2; Item 1164 at ¶ 2. Yet the Board has never offered any explanation as to why the information was not submitted earlier.

Moreover, much of the information contained in the affidavits was confusing. For example, one affidavit attempted to explain why the Board's "spending plan" was higher than the Board's original budget request, and it is clear from this and other affidavits that the spending plan to which the affidavit referred was the $286,733,101 budget for which the Board was requesting funding. Yet the only "spending plan" to which the parties had alluded up to that point was the one that had been approved by the Board in June, 1988, and that plan more closely approximates the Board's originally proposed funding request of approximately $282,000,000, *see* Item 1133, Appendix One at 9, Column 5, and the approximately $282,000,000 budget under which the Board was supposedly operating. *See id.* at Column 7.

In an order dated January 19, 1989, the court granted the City's motion for a preliminary injunction to the extent that it sought to enjoin the Board from implementing any new programs pursuant to its A03 budget request unless and until the court determined that the Board was entitled to funding for those programs. Although the motion was not granted to the extent that it sought to enjoin any other alleged or anticipated overspending by the Board, the Board was reminded that it was expected to comply with its obligations under state law to operate within the City's budget appropriation unless and until the court determined that it was entitled to additional funds. The court also warned the Board that it still had not provided sufficient authority for its claim that it was not required to make an emergency funding request pursuant to New York Education Law § 2576(6) for those portions of its application that exceeded the appropriation originally sought from the City. The court noted, however, that it remained possible for the Board to submit such a request. *See* Item 1166.

By a letter dated January 27, 1989, the court was informed that the Board finally had submitted an emergency funding request to the City pursuant to Section 2576. *See* Item 1178. *See also* Items 1186, 1189, 1192, 1195, 1198, 1200, 1224–25, 1227, 1235,

---

**8.** This figure represents the difference between the figure cited by counsel and the funding gap for the budget for which the Board was requesting funding as of December 28, 1988—$16,458,-101. *See* Item 1133, Appendix One at 9, Column 9. Presumably, counsel's figure was an approximation of the funding gap for the budget under which the Board claimed it was operating as of that date—$11,732,946. *Id.* at Column 7.

**9.** Compare, for example, accounts "A00–1314–474" and "A00–1622–160" in the financial statements for November and December of 1988 (Items 1193, 1216), with accounts "A03 1314 474" and "A03 1622 160" in the Board's 1988–1989 budget book. *See* Item 1201 at 19.

These two accounts also appeared as A00 expenditures in the spending plan filed by the Board on February 28, 1989. *See* Item 1217.

1242. In the letter, counsel for the Board stated that many programs faced early termination due to the "genuine emergency" that had developed "mainly by reason of the passage of time" since the filing of its motion on September 1. Of course, as illustrated by the repeated admonitions from the court, the Board clearly bore the responsibility for the extended delay and any attendant exigency. Referring to "the urgency of the matter," counsel for the Board requested that the City be given no more than two weeks to decide whether it would appropriate any emergency funds. The Board, however, did not provide the City with sufficient detail to make an informed evaluation of the request. *See* Item 1224 at Exhibit H.[10] Compounding the Board's failure in this regard was its failure to comply with the court's orders, as it appears that timely compliance would have provided the City ample information with which to make its decision.

The letter was also significant in other ways. First, it further confused the issues of the quantity of and the rationale for the various components of the additional funding sought by the Board. As indicated above, a significant jurisdictional question was raised by the Board's failure to submit an emergency funding application for those portions of its September 1 funding application to this court that exceeded the appropriation originally sought from the City. Before submitting the letter, the Board had maintained that it learned of these costs between February and June of 1988. The letter, however, intimated that the Board was seeking funds for some unanticipated costs that had arisen after September 1. *See* Item 1178 at 1, 3. Second, the letter informed the court that the Board was withdrawing its A03 requests in the interest of settling the present funding dispute, although it failed to acknowledge that some funds had already been spent on A03 programs. And third, the letter failed to offer any authority for the Board's claim that, at least with regard to unanticipated costs that arose before September 1, it could ignore the requirements of Section 2576(6).

b) *The Court's Expert Witness*

In order to assist with its evaluation of the voluminous and often confusing documents being submitted, the court appointed William D. Mahaney as an expert witness. *See* Items 1134, 1166. *See also* Item 1165 at 4–6. Mahaney is a certified public accountant with extensive experience in governmental accounting in general and educational accounting in particular. *See, e.g.,* Item 1218. He also was intimately familiar with the case at bar, having previously served the court as an expert witness during the funding disputes that culminated in the report and recommendation issued by Magistrate Edmund Maxwell and adopted by this court in 1985. *See* Items 854, 865. After those funding disputes were resolved, Mahaney was retained as the court's expert in an attempt to assist the Board and its staff in improving management of the Board's budget. *See* Items 912, 1050–52.

Mahaney and his assistant, David Spara, worked intensively over a period of approximately two months evaluating documents and meeting with the parties or their representatives, and they prepared three reports that have provided invaluable assistance to the court. *See* Items 1177, 1201, 1213.

In his first report, filed on January 27, 1989, Mahaney supplied the court with a detailed analysis of the Board's funding request based on the documentation sup-

---

**10.** Upon receiving the Board's emergency funding request, the Mayor notified the Board that he believed the documentation supplied by the Board did not provide him sufficient information with which to evaluate the request. *See* Item 1224, Exhibits H and I. In letters dated February 15, 1989, and March 6, 1989, one of the Mayor's attorneys also notified the Board's counsel that the Mayor considered the request inadequate. *See id.* at Exhibit L; Item 1225.

One of the Board's attorneys subsequently questioned whether New York Education Law § 2576(6) even gave the Mayor a role in the initiation of an emergency funding request, and also questioned the Mayor's motives for raising his objections before the Common Council had acted on the request. *See* Item 1235 at ¶¶ 23–27. The Board, however, initiated its emergency funding request by submitting it *to the Mayor*. *See* Item 1224, Exhibit H; Item 1242 at 2.

plied to the court through January 17, 1989, and on interviews he and Spara had conducted with Board and City personnel. Significantly, Mahaney found the documentation submitted to the court by the Board to contain "conflicting and misleading data." Item 1177 at 3. He also noted that, although it knew of many changed conditions that would require adjustments of the original budget submitted to the City even before it learned of the amount ultimately appropriated in June, 1988, the Board failed to report the changes to the City before bringing its motion for additional funding the following September. *Id.* at 2. Mahaney found that at least some of the Board's new budget requests resulted from "poor budgeting, ignoring the law or regulations, or anticipating some favorable actions of the State legislature or the State Education Department that did not materialize." *Id.* at 16. He also noted that the City's argument against appropriating any additional funds appeared to be well-documented based on the information available to it. *Id.* at 21.

Significantly, Mahaney noted that the Board's funding request was no doubt inflated: "There is an obvious tendency to gross up the budget in litigation. Had this action not been instituted, the Board would have accommodated many increases that now inflate its requests." *Id.* at 22.

After Mahaney's first report was filed, the parties agreed that his investigation and analysis were proving extremely helpful, and that he should resume his efforts. Accordingly, the court ordered that Mahaney and Spara be given immediate and complete access to any Board personnel and records necessary for the preparation of another report. Item 1166 at 1.

Mahaney's second report was filed on February 16, 1989, and was based on discussions with and information received from Board and City personnel through February 12, 1989. In that report, Mahaney noted that "[t]he Board possesses all of the information necessary ... to evalu-

ate" its claims, but that he had encountered difficulty in obtaining sufficient information to do so because, "[a]lthough the Board representatives answered the questions asked of them, they volunteered little useable information." Item 1201 at 2. It was thus clear that, despite the explicit orders from the court to lay its cards on the table, the Board was still maneuvering in hope of gaining as much additional funding as possible while revealing as little information as possible. *See id.* at 3.[11] Consequently, Mahaney found that making a precise evaluation of the Board's budget was "difficult if not impossible." *Id.* at 2–3. He found his task further hampered by "the inconsistent information in the Board's affidavits," and by the sheer magnitude of the changes reflected in over 140 accounts since the Board had submitted its original budget request to the City in February, 1988. *Id.* at 3. And, echoing an observation that he had made in his first report, Mahaney noted that he continued to find many examples of unnecessary or inflated budget items, illustrations of what he referred to as the Board "grossing up" its budget. Item 1201 at 5; *see also id.* at 8, 21, 27.

Mahaney's second report also corroborated one of the most frustrating obstacles to adjudication of the present dispute: the Board repeatedly changed the figures it was representing as necessary for compliance with this court's orders without ever acknowledging to the court or to the City that it was doing so. For example, it is clear that the original spending plan of approximately $282,000,000 adopted by the Board in June, 1988, was based on the same budget that the Board originally had submitted to the City the previous February. That budget proposal included approximately $10,000,000 in A03 funding requests. Yet by the time it submitted affidavits in support of its motion on December 28, 1988, *see* Items 1132, 1133, the Board was prepared to operate with a total of $344,335 in A03 funds out of a budget that still totaled approximately $282,000,-000. *See* Item 1133, Appendix One at Col-

---

11. As Mahaney put it in his first report, "[l]egal strategies seemed to inhibit the production of useable documentation for the Court." Item 1177 at 3.

umn 7; Item 1201 at 6–7. These affidavits thus belied the Board's earlier claims it could not comply with the court's desegregation orders unless it received the full amount of A03 funding that it requested from the City in February, 1988. Furthermore, they were also submitted long before the Board withdrew its A03 funding request as indicated in the January 27, 1989, letter to the court from its counsel, thus indicating that the Board's withdrawal of its A03 funding request was not, as claimed, merely a gesture intended to resolve the present dispute. Rather, it was, in fact, an admission by the Board that those funds were not necessary for compliance with the court's desegregation orders, an assessment verified by one of the affidavits filed on March 14, 1989, in which the Board stated that it would not voluntarily reduce expenditures in "what we believe are essential elements of our desegregation program." Item 1238 at ¶ 5.

In addition, Mahaney's second report revealed several significant examples of questionable budgeting decisions made by the Board and savings that the Board had been either unable to find or unwilling to acknowledge. The report also identified many significant deficiencies in the formats used by the Board to make its funding requests, and noted that effective scrutiny of the Board's budgetary practices is jeopardized by the lack of comparability between the Board's budget presentations from year-to-year. Item 1201 at 23–27. Indeed, Mahaney and Spara found the Board's budget presentations to have been prepared so poorly that they concluded that even highly skilled accountants would likely be confused by them if they did not receive "significant technical assistance." *Id.* at 26.

Including savings and other reductions that he was able to identify, Mahaney estimated that the net amount being requested by the Board was $6,877,410. Item 1201 at 23–24. Notably, Mahaney believed that this figure "is probably greater than is necessary to operate the school system for the year 1988–1989," *id.* at 24, and he

stated that the inflated components of the Board's request identified in his report should not be considered exhaustive. *Id.* at 21–22. Reflecting the striking differences between the components of his net total and the Board's original funding request, Mahaney observed that "[t]he Original Budget submitted to the Mayor in February 1988 has, by the Board's omissions and commissions, become almost meaningless to the City." *Id.* at 27.

Following the filing of Mahaney's second report, the court met with the parties on February 21. When the parties expressed confidence that further efforts by Mahaney might uncover additional helpful information, the court directed Mahaney to continue his investigation. *See* Item 1211. Mahaney and Spara then conferred with representatives of the Board over the course of two days, and in a report dated February 24, 1989, Mahaney informed the court that he had discovered an additional $842,000 in savings, Item 1213, leaving a net figure of $6,035,410.

### c) *The Hearing*

The court held a hearing on February 28, 1989. Having given the Board nearly six months to present its case, and having forewarned the Board several times that it should be prepared to document its case without presenting any witnesses, the court limited the hearing to an examination of Mahaney by each party wishing to question him concerning his investigation and analysis. During his testimony, Mahaney described the approach he used during his investigation and explained various portions of his reports.

Although Mahaney testified that, based on the information available to him, he thought that the Board had provided "justification" for the items comprising the net request cited above, Item 1229 at 24, 66, he did not, nor could he, testify that the Board had met its burden of proof with regard to any of those items. As Mahaney testified, the scope of his investigation did not include determining whether particular components of the Board's funding request were related to desegregation. Rather, his

role was simply to assist the court in evaluating the information being submitted by the Board in support of its motion. *See id.* at 100–01. Of course, Mahaney's investigation and analysis were primarily based on, and limited by, information supplied by the Board, and Mahaney testified that he did not feel that he had been provided sufficient information by the Board to determine whether additional savings were possible. *Id.* at 142–43.

Following the hearing, the parties, while continuing to file papers in support of their respective positions, *see* Items 1220–24, 1227, 1235–42, 1246, 1248, 1249, 1254–56, expressed a desire to be given an opportunity to reach a settlement of the present dispute.[12] Despite the extended opportunity granted by the court to do so, however, no accord was achieved.

---

12. In one of its submissions, the Board suggested, amazingly, that the court had not given it a sufficient opportunity to submit evidence in support of its claims, apparently complaining about the court's refusal to allow any of the parties to present witnesses at the hearing other than Mr. Mahaney. *See* Item 1239 at 8. With regard to the adequacy of the opportunity given to the Board to present its case over the last nine months, the record speaks for itself.